Vincent A. BROCK, Plaintiff–Appellant,

v.

Lester WRIGHT, T.G. Eagan and James G. Berbary, Defendants–Appellees.

Docket No. 02–0042.

United States Court of Appeals, Second Circuit.

Submitted: Sept. 3, 2002.

Decided: Jan. 3, 2003.

Vincent A. Brock, #97–B–2794, Collins Correctional Facility, Collins, NY, pro se.

Julie S. Mereson, Assistant Solicitor General, for Eliot Spitzer, Attorney General of the State of New York, (Peter H. Schiff, Senior Counsel, of counsel) Albany, NY, for Defendants–Appellees.

Before: CALABRESI, B.D. PARKER, Circuit Judges, and STEIN, District Judge.*

* The Honorable Sidney H. Stein, United States District Judge for the Southern District of New York, sitting by designation.

1. Represented by counsel below, Brock consented through counsel to have his case finally determined by a magistrate judge. 28 U.S.C. § 636(c).

CALABRESI, Circuit Judge.

Plaintiff–Appellant, Vincent Brock, is an inmate in the custody of the New York Department of Corrections ("DOCS"). In December 1998, Brock suffered a deep laceration to his right cheek when another inmate slashed his face with a knife. Brock received prompt and, by all accounts, adequate medical care for the wound itself. But he alleges that the wound has led to a painful and disfiguring keloid and that various DOCS employees have wrongfully, and in violation of the Eighth Amendment, prevented him from obtaining the care of a dermatologist.

Brock brought suit under 42 U.S.C. § 1983. The district court (Schroeder, M.J., Western District of New York)[1] granted summary judgment to the defendants on the grounds (1) that Brock had failed to adduce evidence that he suffered from a sufficiently serious medical condition, (2) that there was no evidence that the defendants were deliberately indifferent to Brock's medical needs, and (3) that none of the defendants were personally involved in the decision to deny Brock consultation with an outside dermatologist. Brock appeals *pro se*. We affirm the judgment of the district court as to defendants Berbary and Eagan and vacate the judgment as to defendant Wright.[2]

### Factual Background

Our discussion of the facts is informed by the standard of review applicable to appeals from summary judgment. We view the evidence in the light most favor-

2. On appeal, Brock moves to supplement the record, and, for the first time, for summary judgment. In view of our disposition of the case, we DENY his first motion as moot. The second we DENY because it was not raised below and hence is not properly before us. See *Terkildsen v. Waters*, 481 F.2d 201, 204–05 (2d Cir.1973).

able to Brock, drawing all reasonable inferences in his favor. *See Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir.2001). Any doubts about the credibility of an affidavit or deposition are generally left to the factfinder, our role being to determine whether there is indeed no issue of material fact in dispute. *Id.*

Many of the relevant facts are uncontroverted. On December 19, 1998, Brock suffered a serious knife wound to his right cheek, from below the corner of his right lip nearly to the earlobe. The laceration was sutured at a local hospital. After the removal of his sutures, Brock was referred to an outside dermatologist who noted, a little less than a month after the incident, that the wound was "healing remarkably well." The dermatologist's report also indicated that Brock had a history of "keloid formation" and, indeed, was observed at the hospital as having "significant keloid formation on other lacerations." "I would have him [follow up] for a steroid injection, should his laceration begin to keloid in the future," the report concluded.

Keloids are abnormal overgrowths of fibrous tissue that, when triggered by a skin injury, typically extend beyond the location of the original wound. They are elevated above adjacent skin and are discolored. They may continue to grow for years. An affidavit executed by Dr. Syed Farooq on Brock's behalf indicates that, beyond the potential of keloids to cause disfigurement, nerve fibers may become tangled in the overgrown tissue leading to "constant[ ] pain, local irritation, and paresthesias." Such symptoms are likely to be heightened when sensitive parts of the body, such as the face, are affected. The defendants introduced no evidence into the record to rebut this portion of Farooq's affidavit.

According to Brock, soon after he was seen by the dermatologist, the scar did indeed begin to keloid. In addition to anxiety over the prominence of the scar, Brock started experiencing pain. He states:

> The pain ..., [ ] which I continue to endure on a daily basis, can best be described as a throbbing, burning pain. Whenever I move my mouth, for the sake of example, to brush my teeth, eat, yawn, or smile, it feels as though the right side of my face is being stuck with needles. The pain is nagging, it does not subside, and occurs every time I perform one of the aforementioned activities.

Dr. Farooq's affidavit similarly asserts that Brock cannot smile, yawn, brush his teeth, chew food on the right side of his mouth or sleep on his right side without experiencing pain. He also claims that Brock's teeth on the right side are decaying "at an excessive speed" due to Brock's inability to brush them adequately.

Brock alleges that he informed prison medical staff on numerous occasions of the pain he was experiencing as a result of the laceration. But it is not until August 1999 that the first documentation appears that Brock complained of pain from his scar. At that time, he mentioned to a DOCS nurse that his face hurt and that a doctor had recommended steroid injections. The treating nurse noted that a large keloid had formed, prescribed antibiotic ointment, and referred Brock for an outside consultation with a dermatologist. A few days later, a DOCS physician, Dr. John Cetin, examined Brock and concurred in the need for a referral, noting the formation of a large, thick keloid.

The Regional Medical Director, Dr. David W. O'Connell, denied the request for a referral, writing that the nature of the requested consultation was "cosmetic." Although he had an opportunity to do so, Cetin did not appeal the decision of the

medical director. In a subsequent affidavit, Cetin stated that there were no "collateral symptoms" to justify the appeal in light of the DOCS policy, promulgated by Defendant–Appellee Lester Wright, forbidding treatment of keloids in the absence of such symptoms.

Brock responded by filing an inmate grievance requesting that he be allowed to see a dermatologist. He urged that, given his medical history, "arrangements should be made to get me to a dermatologist (outside clinic) A.S.A.P., before further damage is done." The committee—consisting of two inmate representatives and two DOCS representatives—charged with hearing inmate grievances agreed with Brock and requested that Brock be allowed to see an outside dermatologist.

The Superintendent of the Collins Correctional Facility, Defendant–Appellee James Berbary, overturned the decision of the committee, noting only that the request for a consult was denied "by Central Office Medical." Berbary later stated that he "simply deferred to the decision of the Regional Medical Director since this is an issue within his medical opinion and field of expertise."

Brock appealed Berbary's decision to the Central Office Review Committee (CORC), arguing that the denial of medical treatment was causing him "pain, anguish, [and] sleeplessness." CORC affirmed Berbary's decision to deny the consult. The director of the Inmate Grievance Program is Defendant–Appellee T.G. Eagan. As such, Eagan sits as a nonvoting member on the CORC, and his signature appears at the top of the form rejecting Brock's grievance.

Having exhausted the appeals process in the New York prison system, Brock brought this civil rights action in federal district court seeking money damages for DOCS' inadequate treatment of his scar.

## Analysis

■ On appeal, Brock reiterates his argument made to the district court that the refusal of the DOCS defendants to respond adequately to his medical condition constitutes cruel and unusual punishment in violation of the Eighth Amendment. Brock must meet two conditions in order to be successful against any one of the defendants. He must first show that his medical condition is objectively a serious one. *See Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998). Then, Brock must show, for each defendant, that the defendant acted with deliberate indifference to Brock's medical needs. *Estelle,* 429 U.S. at 104, 97 S.Ct. 285; *Chance,* 143 F.3d at 702.

### A. The objective test

In light of the facts in the record, we conclude that the defendants are not entitled to summary judgment on the ground that Brock's medical needs were insufficiently serious to meet the *Estelle* test.

There is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition. In many cases, however, we have set forth factors that should guide the analysis. Thus, in *Chance v. Armstrong,* we referred to a non-exhaustive list of such factors, including: (1) whether a reasonable doctor or patient would perceive the medical need in question as "important and worthy of comment or treatment," (2) whether the medical condition significantly affects daily activities, and (3) "the existence of chronic and substantial pain." 143 F.3d at 702 (citing and quoting *McGuckin v. Smith,* 974 F.2d 1050, 1059–60 (9th Cir.1992)).

In *Chance,* the prisoner's unresolved dental condition, which caused him great

pain, difficulty in eating, and deterioration of the health of his other teeth, was held to be sufficiently serious to meet the *Estelle* standard. *See id.* at 702, 703. Similarly we have held that a tooth cavity is a serious medical condition, not because cavities are always painful or otherwise dangerous, but because a cavity that is not treated will probably become so. *See Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000). And in *Hathaway v. Coughlin,* 37 F.3d 63, 67 (2d Cir.1994), we identified as serious a hip condition that caused a prisoner "great pain over an extended period of time and ... difficulty walking."

Brock has alleged that his scar is a source of chronic pain that interferes with his ability to conduct tasks associated with daily living. This allegation is supported by the affidavit Dr. Farooq made after examining Brock. Importantly, another doctor noted, shortly after Brock sustained the knife wound, that he would follow up with steroid injections if Brock's scar began to keloid. And yet another, Cetin, after the keloid had formed and Brock had complained of pain, referred Brock to an outside dermatologist. Whether Cetin thought the request for outside consultation was "routine," as defendants maintain, or not, the doctor at least thought Brock's condition sufficiently serious to be "worthy of comment."

The totality of the defendants' argument to the contrary is that "[n]otwithstanding plaintiff's claims in this action, the medical evidence does not portray plaintiff's scar as an extremely painful one or as an urgent condition that may result in degeneration." But the defendants point us to *no* medical evidence that actually casts doubt on the conclusions and observations of Dr. Farooq, much less that would lead us to conclude that the evidence adduced by Brock is too insubstantial to raise a material issue as to the seriousness of his medi-

cal condition. The defendants have challenged the veracity of Brock's claims by suggesting that he had failed to mention the scar during several visits to the prison health care unit. But at most that raises a question of credibility for a jury, and we cannot conclude that, as a matter of law, Brock's allegations and Farooq's observations are overstated.

██ The district court held that Brock's scar was not a serious medical condition, because the pain associated with the scar "although uncomfortable and annoying" is not "extreme" and because the scar does not present a risk of serious harm as would an infected wound. The evidence offered by Brock is more fairly characterized as proof of *chronic* pain the magnitude of which probably falls somewhere between "annoying" and "extreme." At summary judgment we must fully credit Brock's and Farooq's affidavits. It follows that the district court either erred in not treating that evidence as true or believed that only "extreme pain" or a degenerative condition would suffice to meet the legal standard. And the latter would also be wrong, for we have long held that "the Eighth Amendment forbids not only deprivations of medical care that produce physical torture and lingering death, but also less serious denials which cause or perpetuate pain." *Todaro v. Ward,* 565 F.2d 48, 52 (2d Cir.1977).

██ We will no more tolerate prison officials' deliberate indifference to the chronic pain of an inmate than we would a sentence that required the inmate to submit to such pain. We do not, therefore, require an inmate to demonstrate that he or she experiences pain that is at the limit of human ability to bear, nor do we require a showing that his or her condition will degenerate into a life-threatening one. Brock has brought forth enough evidence

to establish the seriousness of his condition should a jury fully credit the evidence.[3]

## B. The subjective test

Having concluded that summary judgment may not be granted to the defendants on the ground that Brock's medical condition is not sufficiently serious, we turn to the subjective component of the *Estelle* standard. The district court ruled that none of the defendants showed deliberate indifference to Brock's medical condition. We agree with this assessment with respect to defendants Berbary and Eagan and affirm the grant of summary judgment as to them. But since we find the constitutionality of DOCS' policy on the treatment of keloids, a policy promulgated by defendant Wright, to be an issue in dispute, we vacate the grant of summary judgment to Wright.

■ In order to prove deliberate indifference in a challenge to an prison inmate's conditions of confinement, the prisoner must show that a particular defendant "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Although *Farmer* requires that a plaintiff prove actual knowledge of a risk, evidence that the risk was obvious or otherwise must have been known to a defendant is sufficient to permit a jury to conclude that the defendant was actually aware of it. *Id.* at 842, 114 S.Ct. 1970.

### 1. Defendant Berbary

Superintendent Berbary overturned Brock's claim, accepted by the initial grievance committee, that Brock should receive a dermatology consult. The sole reason Berbary gave in his denial was that the request had been denied by the Regional Medical Director, Dr. O'Connell.

■ Berbary's automatic and complete deference to the very decision Brock grieved is not, by itself, sufficient evidence that Berbary was deliberately indifferent to Brock's serious medical needs. Berbary had no medical training. There is no proof that he was aware that DOCS policy or O'Connell's decision was not protective of Brock's well-being, nor need this conclusion have been obvious to him. Even if we assume that he was aware of the full extent of Brock's condition, there is no evidence that could lead one to suspect that Berbary understood that an outside consultation would be necessary or even useful. This is especially so given the fact that O'Connell had clearly indicated that it would not. At most, Brock's contention that Berbary should not have deferred to O'Connell amounts to an allegation of negligence. But negligence is not deliberate indifference. We, therefore, affirm the district court's grant of summary judgment to Berbary.

### 2. Defendant Eagan

■ Brock does not dispute Eagan's testimony that he was a nonvoting member of the committee that reviewed Brock's

**3.** Since we find the evidence of the physical pain and interference with activities caused by Brock's keloid sufficient to bar summary judgment on this aspect of his claim, we do not pass on the quality of the evidence Brock has proffered regarding the keloid's effect on his mental condition and regarding the severity of his disfigurement. With respect to the latter, we emphasize that we are expressly *not*

suggesting that a condition that causes progressively greater and ultimately serious disfigurement cannot constitute a serious medical condition for purposes of the Eighth Amendment. Merely because a condition might be characterized as "cosmetic" does not mean that its seriousness should not be analyzed using the kind of factors enumerated in our jurisprudence and employed here.

appeal of Berbary's decision. Nor does Brock challenge Eagan's testimony that his usual role on the committee is only to provide information asked for by the voting members. But since Eagan's signature appears at the top of the committee's affirmance of Berbary's decision, since Eagan does recall attending the meeting at which Brock's appeal was discussed, and since Eagan is the director of the committee, Brock asserts that Eagan was involved in the decision to deny the appeal and should have done more to evaluate Brock's condition. In these respects, however, Brock has only alleged—and perhaps adduced evidence of—negligence on Eagan's part. In the circumstances of this case, it was not deliberate indifference for Eagan to defer to the committee's decision to rely on O'Connell's medical judgment.

Of course, Eagan could also be held liable if Brock could prove that the members of the committee were Eagan's subordinates and that Eagan was grossly negligent in failing to prevent them from committing an Eighth Amendment violation. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). But no evidence has been proffered to support this basis of liability. Thus, although Eagan signed the decision of the committee, there is nothing in the record that indicates that Eagan had the power to withhold his signature, or otherwise to overrule, a decision reached by the committee. And Brock's attorneys failed to elicit any testimony from Eagan or to produce any documents demonstrating the degree of control over the selection or retention of committee members that Eagan may have had.[4] Moreover, there has been no showing that the individual committee members acted with deliberate indifference. There is, for example, no evidence that the committee

members had medical training or were otherwise aware that the decision to defer to O'Connell might not be responsive to Brock's true medical needs. Nor is there any claim by Brock that, from the documents the committee had before it, it should have been obvious to the committee that outside consultation was necessary to deal adequately with Brock's condition. We conclude that summary judgment was properly granted to Eagan.

### 3. Defendant Wright

Dr. Wright has been the Chief Medical Officer of DOCS for over seven years. His primary responsibility at DOCS is "to set the overall direction for [DOCS'] provision of health care." It is Wright's promulgation of DOCS' policy on prevention and treatment of keloids that Brock alleges resulted in a violation of his Eighth Amendment rights.

In particular, item # 1.43 of the DOCS manual declares keloids to be among the "[c]onditions and services which, absent the existence of *collateral symptoms,* are considered prima facie medically unnecessary" (emphasis added). Although Wright mentioned at his deposition that this part of the manual predated his appointment, the current policy bears a revision date of January 1996 and is signed on behalf of DOCS by Wright.

 Wright may be held liable if a jury could reasonably find that he "created a policy or custom under which unconstitutional practices occurred or [that he] allowed the continuance of such a policy or custom." *Colon v. Coughlin,* 58 F.3d at 873. While liability may not be established against a defendant simply because that defendant was a "policy maker" at the time unconstitutional acts were committed,

---

**4.** It is, of course, quite possible that Eagan, in fact, had substantial power over the commit-

tee members or their decision. But the record does not show any such control.

see *Cuoco v. Moritsugu,* 222 F.3d 99, 109 (2d Cir.2000), where unconstitutional acts are *the result* of a policy promulgated by the defendant, a valid § 1983 action may lie. It is not seriously in dispute that Wright is responsible for DOCS policy # 1.43.

#### a. *Treatment*

The district court held and the defendants argue, however, that DOCS' policy is a constitutionally valid one. In particular, the defendants contend that "[i]t is not a blanket ban on specialty consultations for treatment of keloids. If there is a reason, aside from a cosmetic, non-medical one, a request to see a dermatologist may be granted."

As an initial matter, it is not at all clear what DOCS policy # 1.43 means. Is the sort of pain Brock has allegedly suffered and that we have identified as constituting a serious medical condition a "collateral symptom" within the meaning of the policy? Wright's own understanding of the policy is ambiguous on this point. He stated at deposition that treatment for keloids is allowed only to the extent that the treatment is performed for "functional" rather than aesthetic reasons. And by functional, he indicated that the treatment would have to make "some difference in the functioning of a body part."

Given these statements, a jury could well find that the policy was intended to bar the treatment of a keloid for purposes of alleviating moderate, but persistently chronic, pain in a body part. Wright gave two examples in which treatment would be allowed. The first was that of a prisoner with a keloid near the eye that interfered with the opening of the eyelid. The second was that of a prisoner whose mental health was so severely impacted by the scar that "it was adversely affecting [his or her] ability to function in society." The giving of two cases of this sort, and no others, itself constitutes evidence from which a jury could conclude that the policy meant to bar from treatment someone with the symptoms Brock allegedly has.

Moreover, along with the other defendants, Wright has argued that both O'Connell and Cetin "properly implemented" the policy.[5] Both doctors in effect stated that Brock had no collateral symptoms, sufficient under the policy, to justify an outside consultation, despite the fact that Brock had, according to Cetin, complained of pain. Since both have cited the policy as the reason for their actions and since Wright concedes that O'Connell and Cetin followed the policy, the question before us is whether following the policy resulted in deliberate indifference to Brock's medical needs. If so, summary judgment may not be granted in favor of Wright, since unconstitutional acts would then have occurred as the result of a policy promulgated by Wright.

---

5. In the motion for summary judgment below, Brock argued that the policy mandates that he should have received the treatment he requested, because the keloid has caused him to have mental health problems and because it interferes with his ability to use his mouth. But Brock also contended that the policy was unconstitutional in its definition of "collateral symptoms." Brock was free to argue, as part of his case, that DOCS officials failed to follow their own policy and, in the alternative, that if they did follow the policy, then the policy itself is unconstitutional. We, therefore, do not deem Brock to have waived the argument that Cetin and O'Connell followed an unconstitutional policy for whose promulgation Wright was responsible. *Cf. Cuoco,* 222 F.3d at 109 (refusing to entertain the argument that a defendant was liable as a policymaker where plaintiff failed to argue that policies were unconstitutional in themselves but had contended instead that they compelled the treatment she sought).

On this issue, we simply note the presence of facts in dispute that could be resolved by a jury in a way that would entitle Brock to relief. It is not controverted that Cetin was aware that Brock was suffering some pain from his scar. The defendants sought to cast doubt on the truthfulness of Brock's claims about the extent of the pain he was suffering and, also, to put into question DOCS' awareness of Brock's condition. But at most, defendants' arguments and evidence to these effects raise issues for a jury and do not justify summary judgment for them.

In summary, looking at all the facts in the record, we think that a reasonable jury, if it fully credited Brock's and Farooq's testimony, could find that it is more likely than not that Cetin (1) knew Brock was experiencing chronic pain, (2) understood that the keloid could cause this sort of pain in the facial area, and (3) recognized that either steroid injections or perhaps other therapies a dermatologist might provide were superior treatments to those provided in the prison. A jury could also conclude, based on the admissions of the defendants and other evidence, that Cetin refused to appeal O'Connell's denial of a dermatological consultation and treatment because he reasonably believed that chronic pain of the type Brock alleged he was suffering was not a collateral symptom within the meaning of the DOCS policy. And a jury could also find that Wright both intended the policy he established to be so read and should have known the consequences for people situated like Brock of such a reading.

b. *Prevention*

Brock has also adduced facts sufficient for a jury to find that the DOCS policy was deliberately indifferent to Brock's receiving necessary medical care to prevent his scar from keloiding. In his affidavit, Farooq stated that, given Brock's history, it was a virtual certainty that his facial laceration would keloid. Farooq further indicated that the sort of pain Brock claims to be experiencing is "not surprising" given the location of the scar. Moreover, still according to Farooq, relatively inexpensive steroid injections "could have" prevented the keloid. Finally, Farooq stated that because preventive steps were not taken, "[r]evision [now] will not correct the damage caused by the keloid formation, although it may reduce it."

At summary judgment, we are bound to credit Farooq's viewpoint that a denial of treatment is nowhere near as efficacious as steroid injections in preventing keloid formation in at-risk individuals. Moreover, a jury could well conclude that steroid injections were not given, not because of a medical judgment—at most negligent—that such prevention was not worthwhile, but because the DOCS policy established by Wright forbade preventative measures in cases such as Brock's. That is, a jury could find—if it credited Farooq's testimony—that the policy precluded steroid shots even when the formation of keloids was nearly certain and where those keloids could produce the sort of chronic pain Brock claims to have. If this is the case, then the policy, the jury may conclude, represents a conscious choice by DOCS to prescribe " 'easier and less efficacious' treatment plan[s]" for prisoners who are either at risk for or who have begun to develop keloids in areas where the keloids will likely cause pain and other medical problems. *Chance*, 143 F.3d at 703 (quoting *Williams v. Vincent*, 508 F.2d 541, 544 (2d Cir.1974)). Such a choice violates the Eighth Amendment. *See id.*

On this ground too summary judgment should not have been granted to Wright.

Accordingly, we VACATE the order of the District Court granting summary judgment to defendant Wright and AFFIRM the grant of summary judgment to defendants Berbary and Eagan. We REMAND the case to the district court for further proceedings consistent with this opinion.