341 F.3d 137
 Juan HERNANDEZ, Plaintiff-Appellant,
v.
John P. KEANE, Dr. Satish Kapoor, Dr. E. Lofton, Dr. Khee Tint Maw, Dr. M.A. Halko, Dr. Alexis Lang, P.A. Philip Williams, Kathy Greiner,
Charles Greiner, C.O. Hattie Cradle, C.O. Edward Clark, Sgt. Marion Brown, and Sgt. Sean Murphy, Defendants-Appellees.
 Docket No. 00-0347.
 United States Court of Appeals, Second Circuit.
 Argued: March 7, 2003.
 Decided: August 20, 2003.
 
 COPYRIGHT MATERIAL OMITTED JASON E. HALPER, Lowenstein Sandler PC, Roseland, N.J. (Martin E. Karlinsky, Katten Muchin Zavis Rosenman, New York, NY, on the brief), for Plaintiff-Appellant.
 WILLIAM B. JAFFE, Assistant Attorney General (Eliot Spitzer, Attorney General of the State of New York, Marion R. Buchbinder, Assistant Solicitor General, on the brief), New York, NY, for Defendants-Appellees.
 Before: WALKER, Chief Judge, JACOBS and CALABRESI, Circuit Judges.
 DENNIS JACOBS, Circuit Judge.
 
 
 1
 Plaintiff-appellant Juan Hernandez, a prisoner in the New York State prison system, sued various state prison officials in the United States District Court for the Southern District of New York (Pitman, J.), alleging that they violated the Eighth Amendment's prohibition on cruel and unusual punishment by their deliberate indifference to his serious medical needs. A jury returned a verdict in his favor and apportioned approximately $108,000 in damages among defendants at Sing Sing Correctional Facility: Charles Greiner, the First Deputy Superintendent; Dr. Satish Kapoor, the medical supervisor; Dr. M.A. Halko, plaintiff's primary care physician; Phillip Williams, a physician's assistant; Kathy Greiner, the Nurse Administrator; and Sgt. Sean Murphy, a corrections officer (collectively, "defendants"). The district court granted defendants' Rule 50 motion for judgment as a matter of law on the ground that there was insufficient evidence that any of the defendants acted with "deliberate indifference," the culpable mental state required to support an Eighth Amendment violation. Hernandez v. Keane ("Hernandez II"), No. 97 Civ. 1267, 2000 U.S. Dist. LEXIS 21948, at *26-*27 (S.D.N.Y. Nov. 17, 2000).
 
 
 2
 For the reasons that follow, we affirm.
 
 BACKGROUND
 
 3
 Juan Hernandez was arrested by the New York City Police Department on November 25, 1992 on charges arising out of an incident in which he sustained multiple gunshot wounds. Numerous bullet fragments were removed from his body at St. Luke's Hospital and at Bellevue Hospital's prison ward; for medical reasons, however, the surgeons did not remove bullet fragments embedded in his left hand. This injury was particularly serious: Hernandez describes the gunshot as having "shattered" and "ripped apart" his hand. Tr. at 52.[1]
 
 
 4
 On December 8, Hernandez was released from police custody on his own recognizance and was transferred from Bellevue's prison ward into the hospital's general population. The next day, against the advice of Bellevue's medical staff, he left the hospital, the bullet fragments still embedded in his hand. According to Hernandez, "[t]he pain was excruciating," and the hand was swollen to "the size of a boxing glove." Id. at 55.
 
 
 5
 Hernandez remained free on his own recognizance for the next five months, from the time he left Bellevue on December 9, 1992, until he was rearrested on April 18, 1993 and placed in the custody of the City of New York's Department of Corrections. During this five-month period he sought no treatment for his hand because (he explained) he could not afford it.
 
 
 6
 Hernandez was then in the City's custody for fifteen months — from April 1993, when he was rearrested, until July 1994, when his criminal trial concluded — during which time he unsuccessfully sought treatment for his hand. No one responsible for his care during this period was named as a defendant in this suit.
 
 
 7
 In July 1994, Hernandez was convicted in state court of attempted murder in the second degree, and was transferred to the custody of the State to serve his sentence. He was initially placed in the Downstate Correctional Facility in Fishkill, New York ("Downstate"). There, Hernandez again sought treatment for his hand but was told that he would not be treated until he arrived at the "next facility." Id. at 59. No one responsible for plaintiff's care at Downstate was named as a defendant in this suit.
 
 
 8
 Hernandez arrived at the Sing Sing Correctional Facility in Ossining, New York ("Sing Sing") on August 24 or 26, 1994, approximately twenty-one months after he sustained the gunshot wound to his left hand. Except for a nine-month transfer to another facility between March 1995 and January 1996, he remained at Sing Sing until he filed this lawsuit in February 1997. The defendants in this appeal all worked at Sing Sing while plaintiff was there.
 
 
 9
 Upon his initial arrival at Sing Sing, plaintiff complained to prison officials about severe pain caused by the bullet fragments in his left hand. He was examined by defendant Philip Williams, a Sing Sing employee whose title was Physician's Assistant. Williams discussed the injury with his supervisor, defendant Dr. M.A. Halko, who was plaintiff's primary care physician. Because Sing Sing had no surgeons on staff, Dr. Halko and Williams referred Hernandez to an outside consultant surgeon, Dr. Louis Rose. Dr. Rose examined Hernandez on October 31, and recommended surgery to remove the gunshot fragments and reconstruct the hand. An operation was scheduled for November, but was cancelled when Dr. Rose became unavailable (through no fault of defendants or anyone else at Sing Sing).
 
 
 10
 In December, no follow-up appointment having been made, Hernandez filed a grievance with the Sing Sing prison administration, recounting his difficulties in getting treatment and complaining that the situation was getting worse: "Yesterday a piece of the metal came halfway out of my hand and is now sticking out. This is very painful." Id. at 67. At trial, Hernandez explained that by this point his hand had contracted into a claw-like shape.
 
 
 11
 Hernandez was thereafter examined by Dr. Halko, who prescribed pain medication, recommended that surgery be performed "ASAP," and arranged a consultation with another outside surgeon, Dr. Richard Magill. Id. at 78. At an examination on December 19, Dr. Magill discussed surgery, and asked that plaintiff return a full month later "to discuss surgery in [further] detail." Id. at 894.
 
 
 12
 Over the next several months, plaintiff was treated by Sing Sing's medical staff for a chronic cyst on his back and for a seizure disorder, but was not sent back to Dr. Magill. Uncontroverted evidence at trial established that in January 1995, Hernandez refused to take medication that Sing Sing medical staff had prescribed to alleviate his seizure condition, and that scheduling surgery in such circumstances "[c]ould be devastating and c[ould] result in grave consequences, including death." Id. at 869. Then, on March 7, Hernandez was transferred from Sing Sing to Elmira Correctional Facility in Elmira, New York ("Elmira"), several hundred miles away. This transfer was generated by a statewide prisoner transfer computer system; however, a Sing Sing policy called for the placement of a medical "hold" to prevent the transfer of patients awaiting hospitalization, surgery, or consultation for a serious or complex illness. The testimony at trial established that medical holds are a "clerical procedure," and an "administrative function." Id. at 614. The evidence hid not establish who had the direct responsibility for placing a hold on Hernandez. The hold policy stated that the nurse administrator, Nurse Prigitano, had primary responsibility for providing the records coordinator with a list of inmates on medical hold, and it appears that she and several other nurses were primarily responsible for placing medical holds. Nurse Prigitano was also directly responsible for scheduling prisoner visits with outside clinics, id. at 622-24, but she was not named as a defendant in this case. Williams, Dr. Halko, or their supervisor, defendant Dr. Satish Kapoor could have placed a medical hold on Hernandez or scheduled a follow-up appointment with Dr. Magill, but they did not do so.
 
 
 13
 At Elmira, prison officials referred Hernandez to (yet another) outside surgeon for advice on possible surgery to remove the gunshot fragments and reconstruct the hand, but this surgeon recommended against such an operation on grounds that the bullet fragments were "not interfering with the use of the hand" and that surgery "could in fact compromise hand function even further." Def. Ex. 389. None of the officials responsible for plaintiff's care at Elmira were named as defendants in this suit.[2]
 
 
 14
 Hernandez was transferred back to Sing Sing in January 1996. After several months of further examinations and testing, Dr. Magill concluded that the benefits of surgery outweighed the risks, and operated to remove the bullet fragments. As part of this operation, a piece of bone was taken from plaintiff's leg and grafted into his hand.
 
 
 15
 The hand did not improve as quickly as hoped after the surgery. Plaintiff attributed this to the following errors or neglects committed by defendants (and others) in the post-operative period: pins and wires inserted in the hand during surgery caused infection when they were not removed within ten weeks (as directed by Dr. Magill); prescribed physical therapy for plaintiff's hand was not provided; and "feed up" passes, issued to allow him to receive meals in his cell when he had difficulty carrying a food tray, were briefly suspended.
 
 
 16
 In February 1997, plaintiff brought suit under 42 U.S.C. § 1983 against defendants and various others involved in his medical treatment at Sing Sing, alleging Eighth Amendment violations and averring that these violations caused permanent damage to his hand.[3] At the conclusion of plaintiff's case, and again at the close of evidence, defendants moved pursuant to Rule 50 of the Federal Rules of Civil Procedure for judgment as a matter of law. The court reserved decision. The jury returned a verdict for Hernandez that apportioned $108,004 in nominal, compensatory, and punitive damages among the defendants (as set out in the margin).[4] The district court declined to enter judgment pursuant to the jury verdict, and granted defendants' Rule 50 motion. The court was "at a loss to find any factual or credible evidence" to support a finding that defendants acted with the culpable state of mind required to support a claim under the Eighth Amendment. Hernandez II, 2000 U.S. Dist. LEXIS 21948, at *26. Having listened to the testimony of nineteen witnesses and reviewed all the evidence, the court held that "the totality of the evidence, [including] the voluminous prison medical records [submitted at trial,] indisputably show[ed] that Plaintiff was well attended, and that no defendant was deliberately indifferent to any serious medical needs of Plaintiff." Id. at *26-*27.
 
 DISCUSSION
 
 17
 We review de novo the district court's ruling granting judgment as a matter of law, Wilkinson v. Russell, 182 F.3d 89, 96 (2d Cir.1999), viewing the evidence in the light most favorable to Hernandez and "grant[ing him] every reasonable inference that the jury might have drawn in [his] favor," Samuels v. Air Transp. Local 504, 992 F.2d 12, 16 (2d Cir.1993).
 
 
 18
 "The jury's role as the finder of fact does not entitle it to return a verdict based only on confusion, speculation or prejudice; its verdict must be reasonably based on evidence presented at trial." Goldhirsh Group v. Alpert, 107 F.3d 105, 108 (2d Cir.1997) (quoting Michelman v. Clark-Schwebel Fiber Glass Corp., 534 F.2d 1036, 1042 (2d Cir.1976)). Accordingly, a Rule 50 motion for judgment as a matter of law must be granted where "(1) [t]here is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2)[t]here is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him." Newmont Mines Ltd. v. Hanover Ins. Co., 784 F.2d 127, 132 (2d Cir.1986). The district court relied on both grounds in granting judgment to all defendants.
 
 
 19
 * * * * * *
 
 
 20
 The Eighth Amendment outlaws "cruel and unusual punishments." U.S. Const. amend. VIII. "This includes punishments that `involve the unnecessary and wanton infliction of pain.'" Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir.1998) (quoting Gregg v. Georgia, 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). While "society does not expect that prisoners will have unqualified access to health care," Hudson v. McMillian, 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992), an inmate can nevertheless prevail on an Eighth Amendment claim arising out of medical care by showing that a prison official acted with "deliberate indifference" to the inmate's serious medical needs. Hathaway v. Coughlin ("Hathaway I"), 37 F.3d 63, 66 (2d Cir.1994) (quoting Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)).
 
 
 21
 In this appeal, the seriousness of plaintiff's medical needs is undisputed; the question is whether there is enough record evidence to support an inference that any defendant acted with a "sufficiently culpable state of mind" in the treatment of those serious medical needs. See Hathaway I, 37 F.3d at 66.
 
 
 22
 "Deliberate indifference" describes a mental state more blameworthy than negligence; but a plaintiff is not required to show that the defendant acted for the "very purpose of causing harm or with knowledge that harm will result." Farmer v. Brennan, 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing Estelle, 429 U.S. at 104, 97 S.Ct. 285). Deliberate indifference is "a state of mind that is the equivalent of criminal recklessness." Hathaway v. Coughlin ("Hathaway II"), 99 F.3d 550, 553 (2d Cir.1996). A showing of medical malpractice is therefore insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces `a conscious disregard of a substantial risk of serious harm.'" Chance, 143 F.3d at 703 (quoting Hathaway II, 99 F.3d at 553).
 
 
 23
 Defendants were sued in their individual capacities; the liability of each therefore depends on a showing that he or she acted with deliberate indifference. See Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994) ("It is well settled in this Circuit that `personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir.1991))); see also Brock v. Wright, 315 F.3d 158, 164 (2d Cir.2003) (stating that plaintiff must show deliberate indifference on the part of a "particular defendant").
 
 
 1. Dr. Kapoor
 
 
 24
 Dr. Kapoor was responsible for overseeing Sing Sing's medical staff, including Williams, Kathy Greiner, and Dr. Halko; but supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on respondeat superior. See Al-Jundi v. Estate of Rockefeller, 885 F.2d 1060, 1065 (2d Cir.1989). Similarly, proof of "linkage in the prison chain of command" is insufficient. Ayers v. Coughlin, 780 F.2d 205, 210 (2d Cir.1985). "Absent some personal involvement by [the supervisory official] in the allegedly unlawful conduct of his subordinates," he cannot be liable under section 1983. Gill v. Mooney, 824 F.2d 192, 196 (2d Cir.1987).
 
 
 25
 The liability of a supervisor under § 1983 can be shown in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring. See Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995) (citing Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994)); see also Brock, 315 F.3d at 165-66.
 
 
 26
 Hernandez made no such showing as to Dr. Kapoor. Dr. Kapoor never examined or diagnosed plaintiff's hand. And he was not directly responsible for placing medical holds on patients; for scheduling treatments or procedures; or for following up on issues such as physical therapy or "feed up" passes. There is no evidence that Dr. Kapoor had notice of, instituted, or became aware of any unconstitutional policy, practice or act, or that he was grossly negligent in supervising his subordinates.
 
 
 27
 Plaintiff argues that the jury could have inferred deliberate indifference from the nature and extent of the constitutional violations committed by the persons Dr. Kapoor supervised (i.e., Williams, Kathy Greiner, and Dr. Halko).[5] This argument is foreclosed by our conclusion, explained below, that none of these defendants violated Hernandez's constitutional rights. While there are circumstances in which a supervisor could be deliberately indifferent to an inmate's serious medical needs (under one or another of the Colon categories of supervisor liability cited above) even if no single subordinate committed an act amounting to a constitutional violation, plaintiff has adduced no evidence on the basis of which a jury could so find in this case.
 
 
 2. Dr. Halko and Williams
 
 
 28
 As plaintiff's primary care physician at Sing Sing, Dr. Halko was the person most directly involved in overseeing plaintiff's treatment and made many of the decisions with respect to Hernandez's care. Williams, a physician's assistant who worked closely with Dr. Halko, examined plaintiff's hand several times. Many of the same facts bear upon the alleged deliberate indifference of Williams and Dr. Halko. Specifically, plaintiff relies on evidence that Williams and Dr. Halko: (1) failed to schedule a follow-up appointment with Dr. Magill between late December 1994 and early March 1995 so that hand surgery could be discussed and possibly performed; (2) failed to place a medical hold to forestall transfer to another prison while surgery was being considered; (3) failed to arrange to have the pins and wires removed from plaintiff's hand within ten weeks after surgery; and (4) failed to ensure that plaintiff received prescribed physical therapy for his hand.
 
 
 29
 Viewing these facts in the light most favorable to plaintiff and drawing every reasonable inference in his favor, we agree with Judge Conti that no reasonable jury could find that either Williams or Dr. Halko were deliberately indifferent. The evidence as to the treatment of plaintiff's hand suggests at most several acts of negligence over a prolonged period. That is not enough to support an Eighth Amendment violation. See Farmer v. Brennan, 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); Hathaway II, 99 F.3d at 553.
 
 
 30
 In Hathaway v. Coughlin, on which Hernandez chiefly relies, we held that a prolonged delay in treatment could support an inference of deliberate indifference. Hathaway, 37 F.3d at 67. In that case, however, the inmate was kept waiting two years before being evaluated for surgery to abate chronic pain in his hips; and during that time his doctors withheld relevant information regarding the cause of the pain: broken pins from an earlier hip surgery. Hathaway, 37 F.3d at 68-69 ("In summary, .... [a] jury could infer deliberate indifference to Hathaway's serious medical needs from [defendant's] failure (1) to disclose the broken pins and to discuss the option of surgery with Hathaway despite his sudden resurgence of hip pain and (2) to refer Hathaway for re-evaluation for surgery [for more than two years] despite requests for further treatment from Hathaway and student attorneys acting on his behalf."); see also Hathaway II, 99 F.3d at 551-52. Here, it was clear to everyone what was causing plaintiff's pain, but unclear for long periods what to do about it. Moreover, the delays were much shorter than in Hathaway.
 
 
 31
 The essential chronology is that Hernandez complained about his hand shortly after his arrival in Sing Sing, and was promptly examined and taken to a surgeon for consultation; the scheduled surgery was put off because the surgeon retained to perform it became unavailable; defendants scheduled a follow-up with another surgeon, who asked for a further consultation a month later to discuss the efficacy of surgery; over the ensuing two and a half months, defendants treated plaintiff's other ailments, after which he was transferred to another prison; and when plaintiff returned to defendants' care and custody in 1996, they acted quickly to schedule surgery.
 
 
 32
 Plaintiff taxes Williams and Dr. Halko with the long passage of time before surgery was performed, during which he suffered for years without treatment; but most of this delay was caused by factors outside defendants' control. Plaintiff was not in their care for long periods, including the almost two years after his injury but before he arrived at Sing Sing (November 1992 — August 1994) and the approximately nine months when he was imprisoned at Elmira (March 1996 — January 1996). The trial experts agreed that the best time for surgery would have been within the first few months of the injury — years before plaintiff arrived at Sing Sing. Plaintiff himself (along with others not sued) was responsible for neglecting treatment during this early period in which it would have been most promising. He emphasizes the long stretch between Dr. Halko's suggestion of surgery "ASAP" in December 1994 and the July 1996 operation, but much of this period passed while plaintiff was at Elmira, where officials (not sued here) determined that surgery was unnecessary and possibly counterproductive. The intervals attributable to defendants are thus reduced to a matter of months, during which plaintiff was either under evaluation for surgery or under treatment for other medical conditions.
 
 
 33
 Plaintiff's claim of deliberate indifference rests largely upon delays in providing a treatment that was risky to begin with. His own expert at trial opined that surgery entailed the risk of doing more harm than good, and conceded that a decision to perform or not perform it was "purely an issue of medical judgment." Tr. at 284-85, 287. This is precisely the sort of issue that cannot form the basis of a deliberate indifference claim. See, e.g., Chance, 143 F.3d at 703 (contrasting deliberate indifference with the exercise of medical judgment). Dr. Halko and Williams had other information available to them suggesting the need for a delay in Hernandez's hand surgery, including Hernandez's refusal to take his anti-seizure medication in January 1995. The failure to perform a risky procedure for a period of less than three months, in light of the defendants' valid concerns at the time, is insufficient to establish deliberate indifference. See Todaro v. Ward, 565 F.2d 48, 53 & n. 5 (2d Cir.1977) (affirming rejection of a deliberate indifference claim based on "access to outside specialists and elective surgery"); see also Hathaway II, 99 F.3d at 553 (comparing deliberate indifference to criminal recklessness).
 
 
 34
 The failure to place a hold on plaintiff, thereby keeping him at Sing Sing while surgery was being contemplated, is likewise insufficient to establish deliberate indifference. The Nurse Administrator, Prigitano, appears to have been directly responsible for maintaining the list of medical holds and scheduling medical appointments, and she and other nurses appear to have been directly responsible for placing a medical hold on Hernandez. Whether or not Nurse Prigitano or these other nurses acted improperly in failing to place a hold or schedule a follow-up appointment with Dr. Magill in January or February 1995, they were not named as defendants. Although some of the defendants, in particular Dr. Halko, could have placed the medical hold, Hernandez offered no evidence at trial that any of the defendants had the direct responsibility, either officially or in practice, for doing so. Defendants' responsibility for placing holds appears to have been supervisory, and any conclusion that they were personally responsible for the failure to place Hernandez's medical hold would have been the result of conjecture. While their failure to place the hold themselves or follow up on the duties of others to do so arguably could support a finding of negligence, Hernandez presented no evidence that the defendants had any reason to doubt the nurses' reliability. Thus, the defendants could not have been reckless or deliberately indifferent in failing to ensure that others had fulfilled their responsibilities, and Hernandez did not offer any evidence that the defendants were deliberately indifferent in failing to fulfill a personal responsibility. (In any event, while the lack of a hold allowed a transfer, it is undisputed that Hernandez's hand was evaluated while he was at Elmira.)
 
 
 35
 As to plaintiff's treatment by Williams and Dr. Halko after the operation, plaintiff cites the late removal of wires, but concedes that he declined a timely opportunity to have the wires removed from his hand on an outpatient basis. As to physical therapy, plaintiff concedes that he was given some post-operative physical therapy—for his leg, from which a bone was taken for grafting, though not for his hand. Further, it is undisputed that Sing Sing had no hand therapist on staff, that defendants attempted to arrange for a visiting therapist, and that plaintiff was given instructions by several doctors on how to perform the necessary therapy on his own hand. "In order to state a cognizable [Eighth Amendment] claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle, 429 U.S. at 106, 97 S.Ct. 285. The post-operative failures adduced at trial, which together amount to no more than mere medical malpractice (if that), are insufficient to evidence deliberate indifference. See Hathaway II, 99 F.3d at 553 (stating that "`mere medical malpractice' is not tantamount to deliberate indifference").
 
 
 3. Kathy Greiner
 
 
 36
 Kathy Greiner was a nurse at Sing Sing when Hernandez arrived there; she was promoted on August 6, 1996 to the position of Sing Sing Nurse Administrator, after Hernandez had received his hand operation. Plaintiff argues that she failed to prevent a transfer or obtain adequate physical therapy. However, it was undisputed at trial that she tried repeatedly to schedule visits with physical therapists from local hospitals and other facilities, but those institutions would no longer send therapists to Sing Sing, and rejected her requests. The lack of therapists for the Sing Sing inmates may be an unfortunate institutional failure, but neither Nurse Greiner nor any of the other defendants are personally responsible for the problem in this case. For substantially the reasons stated above, we reject these claims, and conclude that there is insufficient evidence to support a finding that she was deliberately indifferent.
 
 
 4. Sgt. Sean Murphy
 
 
 37
 There is no evidence that Sgt. Sean Murphy, a corrections officer who started working at Sing Sing in December 1996, played any part in plaintiff's medical care. The only evidence as to Murphy is that he briefly ordered that Hernandez be denied medically-prescribed "feed up" passes. These passes allowed Hernandez to receive food in his cell rather than the prison cafeteria, and were needed on the ground that Hernandez's hand injury made it difficult for him to carry a tray in the cafeteria.
 
 
 38
 Assuming arguendo that a brief deprivation of feed up passes could possibly amount to cruel and unusual punishment, we agree with the district court that no reasonable jury could find that Murphy's actions amount to deliberate indifference. The only testimony as to the reasons for Murphy's actions came from Murphy and his subordinate, corrections officer Hattie Cradle. Both testified that Cradle saw Hernandez walking around the prison with packages in each hand, and that when she reported this sighting, Sing Sing's medical staff ordered a reevaluation of Hernandez's feed up status. The jury exonerated Cradle of liability, and Hernandez offered no evidence that Murphy did anything other than respond to Cradle's observations (whether accurate or not) and the orders of the medical staff. The jury's finding of deliberate indifference by Murphy could therefore only have been the result of speculation or conjecture.
 
 
 5. Defendant Charles Greiner
 
 
 39
 Throughout the relevant period, Charles Greiner was First Deputy Superintendent at Sing Sing. (He became Superintendent shortly after the complaint was filed.) Hernandez's claims against Charles Greiner challenge his review of prison grievances and his failure to act upon learning of alleged constitutional violations by Sing Sing officials. We have already determined that there was no constitutional violation by the other defendants in this appeal, and no argument has been made that other Sing Sing officials violated plaintiff's constitutional rights or that Charles Greiner's liability should be made to rest on such violations; nor is there any evidence from which his liability could be established under any of the other categories of supervisor liability set forth in Colon. Charles Greiner quickly delegated responsibility for investigating the grievances to other prison staff. Many of the problems as to which Hernandez filed grievances were resolved either before or shortly after Charles Greiner had a chance to learn of them. Thus, there was no evidence that he was deliberately indifferent.
 
 
 40
 * * * * * *
 
 
 41
 In sum, we agree with the district court that there is insufficient evidence to establish that any one of the defendants was deliberately indifferent to plaintiff's serious medical needs. It is possible that the evidence would support findings of negligence or malpractice as to one or more of the defendants, or as to certain prison personnel as a group; it might support findings that the system of treatment (as a whole) broke down or misfired in some way in the particular instance of this inmate's hand; it might even support findings that someone involved in Hernandez's care (other than the defendants at issue in this appeal) was deliberately indifferent. But none of these findings is relevant to this appeal or to the resolution of any lawsuit brought under 42 U.S.C. § 1983 against these defendants. Because plaintiff failed to present evidence that any defendant violated his rights under the Eighth Amendment, the judgment of the district court is affirmed.
 
 
 
 Notes:
 
 
 [1]
 Citations to "Tr. at 52" refer to the trial transcript
 
 
 [2]
 In his third amended complaint, plaintiff did name as a defendant Dr. Mark S. Anthony, the Elmira consultant who recommended against surgery. This claim was dismissed on stipulation, pursuant to Rule 41(a)(1)(ii) of the Fed.R.Civ.P
 
 
 [3]
 Hernandez's Third Amended Complaint also asserted claims against nine defendants not part of this appeal. The claims against two were dismissed before trial,see Hernandez v. Keane ("Hernandez I"), 97 Civ. 1267, 2000 WL 16951, 2000 U.S. Dist. Lexis 89, at *13 (S.D.N.Y. Jan. 7, 2000) (Jones, J.), and the jury exonerated the other seven of liability. Hernandez does not challenge the dismissal of his claims against these other defendants.
 
 
 [4]
 The jury apportioned damages as follows:
 Compensatory/Nominal Punitive
Defendant Damages Damages

Dr. Kapoor $ 1 $25,000
Dr. Halko $40,000 $10,000
Williams $ 1 $13,000
K. Greiner $ 1 $ 0
C. Greiner $20,000 $ 0
Murphy $ 1 $ 0
 
 
 [5]
 There is no allegation that any of Dr. Kapoor's other subordinates violated plaintiff's rights